## Case No. 14,209.

### TRYPHENIA v. HARRISON.

[1 Wash. C. C. 522.] 1

Circuit Court, D. Pennsylvania. Oct. Term, 1806.

FORFEITURE—SLAVE TRADE—CARRYING AS PASSENGERS.

1. Libel in the nature of an information, for a violation of the act of congress, prohibiting the slave trade. The vessel, the property of a citizen of the United States, being at St. Thomas, took on board, as passengers, two ladies, with some slaves, their domestic servants, for all of whom the price of their passage was paid at Havana, where the ladies and their slaves were landed. The slaves were not carried for sale, nor in any other manner than as the property of the ladies, and as their attendants. Held, that the law of the United States, passed 22d March, 1794 [1 Stat. 347], was intended to prohibit any citizen or resident of the United States from equipping vessels within the United States, to carry on trade or traffic in slaves to any foreign country.

2. The law of 10th May, 1800 [2 Stat. 70], extends the prohibitions to citizens of the United States, in any manner concerned in this kind of traffic, either by personal service on board of American or foreign vessels, wherever equipped; and to the owners of such vessels, citizens of the United States.

3. The provisions of those laws, were not intended to apply to a case, where slaves are carried from one foreign port to another as passengers, and not for sale.

[Cited in The Wanderer, Case No. 17,139.]

This was an appeal, pro forma, from the district court [for the district of Pennsylvania]. It was a libel, in the nature of an information, against the brig, for a violation of the act of congress of the 22d of March, 1794, prohibiting the slave trade from the United States to foreign countries. The answer and claim of Crousillat, the owner of the brig, denied that the brig had been engaged in carrying on trade or traffic in slaves; and in opposition to the particular charge laid in the libel, of transporting slaves from St. Thomas to the Havana, stated; that the slaves were the property of two French ladies, taken on board the

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

brig at St. Thomas, and carried to the Havana, who paid the price of passage for themselves and their slaves; and that they were not carried for sale or traffic, but as the servants, or attendants of those passengers. The answer was fully supported, by the evidence of the two lady passengers, the supra-cargo, and another witness.

Lewis & Rawle, for appellee, insisted, that whatever might be the construction of the act of 1794, the act of 10th May, 1800, prohibits the transportation of slaves from one foreign country to another; and that in this case it is admitted, that the slaves in question, were carried from St. Thomas to the Havana. That the last law was intended to go much farther than the first, in order to render a violation of its provisions more difficult to be effected.

Ingersoll & Duponceau, for appellants, contended; that the two laws were to be construed together, and that the obvious intention of both was, to interdict the carrying slaves from one country to another, with a view to traffic; and that no such trading was proved in this case, but the contrary.

WASHINGTON, Circuit Justice. No person can doubt, but that the act of 1794 was intended to prohibit any citizen of, or resident in the United States, from equipping vessels within the United States, with a view to carrying on the trade or traffic in slaves, to any foreign country. But, as this law was confined to vessels equipped in the United States for this purpose, and it might be difficult to prove that such was the intention of the equipment, and indeed the provisions of this law did not reach the mischief, since citizens of the United States might, without such equipments, contribute in other ways to carrying on this inhuman and unjustifiable traffic; the act of 1800 was passed in addition to the former acts, and extends the prohibition to citizens of the United States, in any manner concerned in this kind of traffic, either by personal service on board of American, or foreign vessels, wherever equipped; and also, to the owners of such vessels. The words of this last law, I admit, are so general as to extend to the case of transporting slaves from one foreign country to another; but this law must be construed in connection with the former, which was not intended to embrace a new subject, but to render the former law more effectual, for prohibiting the slave trade. If a doubt could exist on this subject, it is cleared up by the latter law; which, differing from the second only as to the vessel on board of which the citizen has served, immediately varies the expression, and speaks not of a vessel employed, in carrying slaves from one country to another, but of one employed in the slave trade. Whatever may be the true construc-

tion of these laws, as to the carrying slaves from one country to another, even for sale; I very much question, if it was in the contemplation of congress, to go farther than to prohibit American citizens from carrying on this trade from Africa, or other countries, so as to consign to slavery, those who were free in their own country. This was laudable. But why should congress prohibit the carrying persons, already slaves in one of the West India islands, to be sold in another? The situation of these unfortunate persons, cannot be rendered worse by this change of situation and masters. This, however, is a mere suggestion as to the probable intention of the legislature. The construction of the two laws may possibly force us to a different conclusion. At any rate, neither of the laws extend to the present case; it being clearly proved, that the negroes in question, were not carried to the Havana for sale. Sentence reversed, and claim sustained.